**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: | : | MDL DOCKET NO. 1948 |
| VTRAN MEDIA TECHNOLOGIES, | : | |
| LLC, PATENT LITIGATION | : | ALL CASES |

**<u>MEMORANDUM</u>**

**Kauffman, J.**                                              **July  17 , 2009**

## I.  INTRODUCTION

The instant litigation arises from a patent dispute between Plaintiff VTran Media Technologies, LLC ("Plaintiff") and various Defendants.[1]  Plaintiff is the assignee of two patents: U.S. Patent No. 4,890,320 (the "'320 Patent") and U.S. Patent No. 4,995,078 (the "'078 Patent"). Plaintiff filed patent infringement actions against Defendants throughout the United States, and on June 10, 2008, the Judicial Panel on Multidistrict Litigation transferred all actions to this Court for coordinated pretrial proceedings pursuant to 28 U.S.C. § 1407.

The '320 Patent was issued on December 26, 1989 from U.S. Patent Application Serial Number 07/204,585 (the "'585 application") and is entitled "Television Broadcast System for

---

[1]      The Defendants in this litigation are cable companies that offer "video on demand" services.  Several Defendants have been dismissed voluntarily from the case.  The remaining Defendants are: Comcast Corporation; Charter Communications, Inc.; Time Warner Cable, Inc.; Cox Communications, Inc.; Cablevision Systems Corporation; Bright House Networks, LLC; Mediacom Communications Corporation; Harron Communications, L.P.; Gans Communications, L.P.; Armstrong Utilities, Inc.; Blue Ridge Cable Technologies, Inc.; Buckeye Cablevision, Inc.; Massillon Cable TV, Inc.; WideOpenWest Cleveland, Inc.; WideOpenWest Finance, LLC; Insight Communications Company, Inc.; Astound Broadband, LLC; Wave Broadband, LLC; Midcontinent Communications; Knology, Inc.; RCN Corporation; and Service Electric Television, Inc.

Selective Transmission of Viewer-Chosen Programs at Viewer-Requested Times."  While the '585 application was pending, the inventors filed U.S. Patent Application Serial Number 07/419,263 (the "'263 application"), which was issued as the '078 Patent on February 19, 1991 with the title "Television Broadcast System for Selective Transmission of Viewer-Chosen Programs at Viewer-Requested Times."  The '320 Patent and the '078 Patent share virtually identical specifications.

When the actions were transferred to this Court on June 10, 2008, a motion to dismiss Plaintiff's Complaint was pending in E.D. Pa. Civil Action No. 08-3050.[2]  On November 3, 2008, the Court denied the motion to dismiss.  In re VTran Media Techs., LLC Patent Litig., 2008 U.S. Dist. LEXIS 91440 (E.D. Pa. Nov. 3, 2008).  On December 31, 2008, the parties submitted a joint claim construction and prehearing statement outlining the four claim terms in dispute.  On February 24, 2009, the Court held a claim construction hearing on the four terms.[3]

## II.  PRINCIPLES OF CLAIM CONSTRUCTION

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude."  Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1115 (Fed. Cir. 2004).  "Claim construction is a matter of

---

[2]    The motion to dismiss, filed by Cablevision Systems Corporation, asserted that Plaintiff does not have the complete ownership interests in the Patents-in-Suit.  Although the motion was filed only by Cablevision Systems Corporation, it applied to all of the pending actions because it challenged Plaintiff's standing to enforce the Patents-in-Suit.

[3]    A claim construction hearing is also known as a Markman hearing, based on the Supreme Court's decision in Markman v. Westview Instruments, 517 U.S. 370 (1996). Following such a hearing, the Court must determine, as a matter of law, the proper construction of any disputed terms or phrases in the patents.

resolution of disputed meanings and technical scope, to clarify and when necessary to explain

what the patentee covered by the claims, for use in the determination of infringement." U.S.

Surgical Corp. v. Ethicon, Inc., 103 F.3d 1554, 1568 (Fed. Cir. 1997).  A court construing a

patent claim must "accord a claim the meaning it would have to a person of ordinary skill in the

art at the time of the invention."  Innova/Pure Water, Inc., 381 F.3d at 1116; see also Phillips v.

AWH Corp., 415 F.3d 1303, 1313 (Fed. Cir. 2005) ("[T]he ordinary and customary meaning of a

claim term is the meaning that the term would have to a person of ordinary skill in the art in

question at the time of the invention, i.e., as of the effective filing date of the patent

application.").  "The inquiry into how a person of ordinary skill in the art understands a claim

term provides an objective baseline from which to begin claim interpretation.  That starting point

is based on the well-settled understanding that inventors are typically persons skilled in the field

of the invention and that patents are addressed to and intended to be read by others of skill in the

pertinent art."  Phillips, 415 F.3d at 1313 (citation omitted).

### A.  Intrinsic Evidence

"In determining the meaning of disputed claim language, a court looks first to the

intrinsic evidence of record, examining, in order, the claim language itself, the specification, and

the prosecution history."  Alza Corp. v. Mylan Labs, Inc., 391 F.3d 1365, 1370 (Fed. Cir. 2004).

### 1.  Claim Language

With respect to the claim language, "the claims themselves provide substantial guidance

as to the meaning of particular claim terms."  Phillips, 415 F.3d at 1314.  Furthermore, "the

context in which a term is used in the asserted claim can be highly instructive."  Id.  "Other

claims of the patent in question, both asserted and unasserted, can also be valuable sources of

enlightenment as to the meaning of a claim term." Id. (citing Vitronics Corp. v. Conceptronic, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  Because "a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning," however, the Court must read the claim language in view of the specification and the prosecution history.  Vitronics, 90 F.3d at 1582.

### 2. Specification

With respect to the specification, also known as the written description of the patent, it "is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."  Phillips, 415 F.3d at 1315 (quoting Vitronics, 90 F.3d at 1582); see also Merck & Co. v. Teva Pharms. USA, Inc., 347 F.3d 1367, 1371 (Fed. Cir. 2003) ("A fundamental rule of claim construction is that terms in a patent document are construed with the meaning with which they are presented in the patent document. Thus claims must be construed so as to be consistent with the specification, of which they are a part." (citations omitted)); Multiform Desiccants, Inc. v. Medzam, Ltd., 133 F.3d 1473, 1478 (Fed. Cir. 1998) ("The best source for understanding a technical term is the specification from which it arose, informed, as needed, by the prosecution history.").  "The importance of the specification in claim construction derives from its statutory role.  The close kinship between the written description and the claims is enforced by the statutory requirement that the specification describe the claimed invention in 'full, clear, concise, and exact terms.'"  Phillips, 415 F.3d at 1316 (quoting 35 U.S.C. § 112, ¶ 1).  The specification may reveal a special definition given to a claim term, or "an intentional disclaimer, or disavowal, of claim scope by the inventor."  Id.  If the specification alters the scope or definition of a claim term, the meaning dictated by the

-4-

specification governs, even if the claim term has a "meaning it would otherwise possess."  Id.

### 3. Prosecution History

Finally, with respect to the prosecution history, which includes the complete record

before the U.S. Patent and Trademark Office along with any prior art cited and distinguished

during the patent examination, courts have found that it also is "of critical significance in

determining the meaning of the claims."  Vitronics, 90 F.3d at 1582.  "Like the specification, the

prosecution history provides evidence of how the PTO and the inventor understood the patent.

Furthermore, like the specification, the prosecution history was created by the patentee in

attempting to explain and obtain the patent."  Phillips, 415 F.3d at 1317 (citation omitted).

However, "because the prosecution history represents an ongoing negotiation between the PTO

and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the

specification and thus is less useful for claim construction purposes."  Id.  Nevertheless,

examination of the prosecution history can be useful in understanding "how the inventor

understood the invention and whether the inventor limited the invention in the course of

prosecution, making the claim scope narrower than it would otherwise be."  Id.  In cases "where

the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of

prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with

the scope of the surrender."  Omega Eng'g, Inc. v. Raytek Corp., 334 F.3d 1314, 1324 (Fed. Cir.

2003).  Prosecution disclaimer operates as a form of estoppel to ensure that a patentee may not

construe claims one way in order to obtain the patent and then, in an infringement suit, attempt to

construe the same claims another way.  See Chimie v. PPG Indus., Inc., 402 F.3d 1371, 1384

(Fed. Cir. 2005) ("Such a use of the prosecution history ensures that claims are not construed one

way in order to obtain their allowance and in a different way against accused infringers.").

### B.  Extrinsic Evidence

Generally, analysis of intrinsic evidence alone provides sufficient guidance to construe a claim properly.  In such cases, the Court should not examine extrinsic evidence in claim construction.  See Vitronics, 90 F.3d at 1583 ("In those cases where the public record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper.  The claims, specification, and file history, rather than extrinsic evidence, constitute the public record of the patentee's claim, a record on which the public is entitled to rely.").  "Nonetheless, because extrinsic evidence can help educate the court regarding the field of the invention and can help the court determine what a person of ordinary skill in the art would understand claim terms to mean, it is permissible for the district court in its sound discretion to admit and use such evidence."  Phillips, 415 F.3d at 1319.  Such evidence can include learned treatises, dictionaries, expert testimony, or any other evidence external to the patent prosecution history.  Id. at 1317.  Extrinsic evidence is considered less reliable than intrinsic evidence, and therefore "it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence."  Id. at 1319.

### C.  Means-Plus-Function Limitations

While patent claims often recite an invention's elements as physical structures (e.g., "oar" or "brake"), patent law permits an applicant to describe an element of an invention in terms of its function (e.g., "a means for rowing" or "a means for stopping").  See 35 U.S.C. § 112, ¶ 6.  "Claim construction of a means-plus-function limitation includes two steps.  First, the court must determine the claimed function.  Second, the court must identify the corresponding structure in

the written description of the patent that performs that function."  Applied Med. Res. Corp. v. U.S. Surgical Corp., 448 F.3d 1324, 1332 (Fed. Cir. 2006) (citation omitted).  In every instance, "function must be determined before corresponding structure can be identified."  JVW Enters., Inc. v. Interact Accessories, Inc., 424 F.3d 1324, 1330 (Fed. Cir. 2005).

In determining the function for a means-plus-function limitation, the principles of construction discussed above continue to apply, and "a court may not construe a means-plus-function limitation 'by adopting a function different from that explicitly recited in the claim.'" Id. at 1331 (quoting Micro Chem., Inc. v. Great Plains Chem. Co., 194 F.3d 1250, 1258 (Fed. Cir. 1999)).  Additionally, "a court errs 'by importing the functions of a working device into the[] specific claims, rather than reading the claims for their meaning independent of any working embodiment.'"  Id. (quoting Rodime PLC v. Seagate Tech., Inc., 174 F.3d 1294, 1303 (Fed. Cir. 1999)).

"After identifying the claimed function, the court must then determine what structure, if any, disclosed in the specification corresponds to the claimed function."  Cardiac Pacemakers, Inc. v. St. Jude Med., Inc., 296 F.3d 1106, 1113 (Fed Cir. 2002).  The corresponding structure identified must perform the claimed function and be clearly linked in the specification to the performance of the function.  See id. ("In order to qualify as corresponding, the structure must not only perform the claimed function, but the specification must clearly associate the structure with performance of the function.").  Whether the specification adequately sets forth structure corresponding to the claimed function must be considered from the viewpoint of one skilled in the art.  See Intel Corp. v. VIA Techs., Inc., 319 F.3d 1357, 1365-66 (Fed. Cir. 2003).

## III.  DISPUTED CLAIM TERMS

### A.  Disputed Claim Term #1: "a television transmission system . . ."

The first term in dispute is:[4]

> *"a television transmission system . . . for transmitting television programs thereover for reception by a plurality of receivers"* ('320 Patent, Claim 1 Preamble)

> *"a television transmission system for transmitting programs thereover for reception by a plurality of receivers"* ('078 Patent, Claim 10 Preamble)

- **Plaintiff's Proposed Construction: "a system for transmitting programs to receivers"[5]**

- **Defendants' Proposed Construction: "a system that allows multiple viewers to choose the same program at the same time such that once the chosen program is scheduled for transmission on a particular channel, additional viewers can be added by transmitting the appropriate descrambling signals to the requesting viewer's receiver"**

### 1.  Whether the Preambles Are Limiting

Plaintiff first argues that because this term appears in the preambles of the claims, it is merely informational and does not limit the claims.  Accordingly, Plaintiff maintains, the term is of no significance to claim construction and need not be construed by the Court.  See Pitney

---

[4]      Although the disputed term is phrased slightly differently in each patent, the parties agree that the term should be construed the same for both patents.

[5]      Plaintiff argues that all four disputed terms need not be construed by the Court, but in the event the claims are construed, it has offered proposed constructions for each.

Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1305 (Fed. Cir. 1999) ("If . . . the body of the claim fully and intrinsically sets forth the complete invention, including all of its limitations, and the preamble offers no distinct definition of any of the claimed invention's limitations, but rather merely states, for example, the purpose or intended use of the invention, then the preamble is of no significance to claim construction because it cannot be said to constitute or explain a claim limitation.").  According to Plaintiff, the claim preambles merely clarify that the claimed methods are to be performed within preexisting cable television systems, but nothing in the preambles should be read to otherwise limit the claims.

As the Federal Circuit has held, a preamble is limiting only "if it recites essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim."  Symantec Corp. v. Computer Assocs. Int'l, Inc., 522 F.3d 1279, 1288 (Fed. Cir. 2008) (internal quotation marks omitted) (quoting Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc., 289 F.3d 801, 808 (Fed. Cir. 2002)).  "A preamble is not limiting, however, 'where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention.'"  Id. (internal quotation marks omitted) (quoting Catalina, 289 F.3d at 808).  In Symantec, the Federal Circuit explained the general rule in determining whether or not a preamble should be read as a limitation:

> Absent clear reliance on the preamble in the prosecution history, or in situations where it is necessary to provide antecedent basis for the body of the claim, the preamble "generally is not limiting."  Thus, in general, the purpose of a claim preamble is to give context for what is being described in the body of the claim; if it is reasonably susceptible to being construed to be merely duplicative of the limitations in the body of the claim (and was not clearly added to overcome a rejection), we do not construe it to be a separate limitation.

Id. at 1288-89 (internal citation omitted) (quoting Catalina, 289 F.3d at 809).

Despite Plaintiff's argument that the preambles merely provide context, however, the Court finds that the preamble of Claim 10 of the '078 Patent recites essential structure—"a television transmission system"—that is referred to later in the method claims.  See '078 Patent, 13:17-20 ("providing a central unit having a collection of stored programs stored on a medium allowing selective reproduction and real-time transmission of said programs over the system" (emphasis added)); id. at 13:25-14:3 ("responding in said central unit to said viewer's request by selecting said viewer-chosen program from said collection and by transmitting in real time over the system said viewer-chosen program at said viewer-requested time for reception by the receiver associated with said requesting viewer" (emphasis added)).  The introduction of the "system" in the preamble and the references to the "system" in the claim body demonstrate that the preamble does more than provide context: it gives meaning to the claim itself, as the later references to "the system" would be meaningless without their antecedent basis in the preamble. See NTP, Inc. v. Research in Motion, Ltd., 418 F.3d 1282, 1305-06 (Fed. Cir. 2005) (finding that a preamble limited the claims where the preamble contained "at least one of a plurality of destination processors in the electronic mail system" and the body of the claim referred to "the at least one of the plurality of destination processors"); Seachange Int'l, Inc. v. C-COR Inc., 413 F.3d 1361, 1375-76 (Fed. Cir. 2005) (finding the preamble of a method claim limiting where it described a "processor system" and the body of the claim described several steps of the method that involve "said processor systems"); Pitney Bowes, 182 F.3d at 1306 (finding the preamble limiting where, inter alia, it stated that "the patent claims a method of or apparatus for 'producing on a photoreceptor an image of generated shapes made up of spots'" and the body of the claim contained the term "generated shapes" that could "only be understood in the context of the

preamble statement"). The "system" referred to in the claimed methods can only be the same "system" first mentioned in the preamble. If the claimed methods are not performed using the "system," they could not be performed at all.

Likewise, the preamble of Claim 1 of the '320 Patent recites essential structure of the system necessary to give meaning to the methods claimed. For example, the "land lines" of the system are first introduced in the preamble and then referred to several times in the body of the claim. See '320 Patent, 10:46-49 ("providing a collection of stored programs stored on a medium allowing selective reproduction and real-time transmission of said stored programs over the land lines" (emphasis added)); id. at 10:54-55 ("transmitting said chosen program in real-time over said given section of the land lines" (emphasis added)). The same is true for the system's "receivers" described in the preamble. See id. at 10:59-60 ("preventing intelligible viewing of said chosen program at said requested time on all other receivers of said given section" (emphasis added)). Without the structure of the system recited in the preamble, the references to land lines and receivers would be meaningless. Accordingly, because the preambles provide an antecedent basis for the claims, the Court concludes that they should be construed as limiting.

### 2. Construction of the Disputed Term

With respect to how the term "television transmission system" should be construed, Defendants argue that their construction has support in the specification, which imparts a special meaning to the term. The Court agrees. The specification describes the system of the "present invention" as one that allows multiple viewers to view the same transmission of a program at the same time:

[T]he present invention minimizes the risk that the viewer will be unable to view

> the chosen program at the viewer requested time.  This risk is minimized for two reasons.  First, the preferred embodiment hereof designates sections of the land lines . . . . Secondly, the present invention allows as many viewers as are connected to the system to choose the same program at the same time.

'320 Patent, 10:9-19 (emphasis added).  While it would be improper to import limitations from a preferred embodiment to the claim, statements describing "the present invention" (as opposed to "the preferred embodiment") can and do limit the scope of the invention.  See, e.g., Verizon Servs. Corp. v. Vonage Holdings Corp., 503 F.3d 1295, 1308 (Fed. Cir. 2007) ("When a patent thus describes the features of the 'present invention' as a whole, this description limits the scope of the invention.");  SciMed Life Sys. v. Advanced Cardiovascular Sys., Inc., 242 F.3d 1337, 1343 (Fed. Cir. 2001) ("[T]he characterization of the coaxial configuration as part of the 'present invention' is strong evidence that the claims should not be read to encompass the opposite structure.").  Indeed, in the very same paragraph in which the applicants refer to "the present invention," they state that "[t]he preferred embodiment" performs specific functions that help minimize the risk that a viewer will be unable to view a program at a given time.  '320 Patent, 10:12-16.[6]  The fact that the applicants used "preferred embodiment" and "present invention" in consecutive sentences demonstrates that the applicants knew when they were defining the invention as a whole and when they were discussing only a preferred embodiment.  Therefore, the Court accepts the applicants' statement that "the present invention allows as many viewers as are connected to the system to choose the same program at the same time."

---

[6]    As discussed at length in the Court's Memorandum and Order denying Cablevision System Corporation's Motion to Dismiss, the patents originally were obtained by H. Vincent Monslow and Steven Dickey.  After a series of transfers, Plaintiff now holds both patents.  Accordingly, "the applicants" means Mr. Monslow and Mr. Dickey.

Defendants' construction is further supported by the prosecution history.  During prosecution of the '320 Patent, the applicants distinguished their invention from a prior art reference by stating the following:

> One important reason for this capability is that the <u>applicants' system</u> allows many viewers . . . to choose the same program for viewing at the same time.  As explained at page 20, lines 6 <u>et seq.</u> of the specification [column 10, line 16 <u>et seq.</u> of the '320 Patent], this is permitted because, once a chosen program is scheduled for transmission on a particular channel . . . additional simultaneous viewers can be added on command at the central site simply by transmitting the appropriately addressed de-scrambling signals to the additional requesting viewers' receivers.

'320 Patent, 7/6/89 Resp. to Office Action at 8 (emphasis added); <u>see also id.</u> at 9 ("It is this ability to permit many users to use <u>shared</u> resources (including shared transmission lines)—while <u>yet</u> permitting each viewer to individually select a desired program for viewing at a desired time which provides many of the advantages of the <u>applicants' system</u>." (emphasis added)).  Again, the applicants described the "system" as one that allows multiple viewers to view the same transmission at the same time and stated that the way in which the system accomplished this goal is to send appropriate descrambling signals to requesting viewers.

Examination of both the specification and the prosecution history supports the conclusion that the applicants gave special meaning to the "system" in the '320 and '078 Patents.  They clearly and consistently described a television transmission system that allowed multiple viewers to watch the same program transmission simultaneously and that used descrambling signals to achieve this objective.  To construe the disputed term simply as "a system for transmitting programs to receivers" would fail to capture the precise meaning used by the applicants.  Accordingly, the Court will adopt Defendants' construction.

**B.  Disputed Claim Term #2: "a requested time"/"a viewer-requested time"**

The second term in dispute is:[7]

> *"a requested time"* ('320 Patent, Claim 1)

> *"a viewer-requested time"* ('078 Patent, Claim 10)

• **Plaintiff's Proposed Construction: "the time a viewer asks to receive a program"**

• **Defendants' Proposed Construction: "a specific time of day chosen and scheduled by the viewer where at the time the choice is made the viewer can choose from among multiple available times of day"**

Defendants argue that Plaintiff's proposed construction, "the time a viewer requests a program," oversimplifies the term by failing to distinguish between the two "times" at issue in the instant patents: (1) the time that a request is made, and (2) the time scheduled by the viewer for the transmission of the chosen program to begin.[8]  The Court agrees.  As explained by the specification, the instant patents differed from prior art that did "not allow the viewer to determine when the program is to be scheduled."  '320 Patent, 2:42-43.  Indeed, during the prosecution history of the patents, the applicants distinguished the present invention from prior art that scheduled transmission times (a) by the provider only (meaning that viewers could never schedule the time of the program), or (b) on-demand (meaning that programs are transmitted as soon as possible after the viewer requests the program, but viewers cannot schedule the program

---

[7]       As with the first term in dispute, the parties agree that this term, which is phrased differently in the two patents, has a single meaning.

[8]       For example, a person using the system could, at 6:00 p.m., schedule a program for transmission at 8:00 p.m.  Thus, Defendants explain, Plaintiff's proposed construction "the time a viewer asks to receive a program" is ambiguous as to which "time" it refers.

at a later, specific time).  See '078 Patent, 5/21/90 Resp. to Office Action at 9-10 (noting the examiner's statement that none of the prior art "shows the system where the viewer has control over the time of showing of the selection as claimed by Applicants" and explaining that permitting viewers to control scheduling was a "distinguishing feature" of the '078 Patent). Because of the ambiguity engendered by "a time a viewer requests a program," which can be read in a way specifically disclaimed by the applicants (i.e., a viewer can "request" a time by ordering a program that arrives immediately, but cannot order a program to arrive in the future), the Court declines to adopt Plaintiff's proposed construction.[9]

However, Defendants' proposed construction "a specific time of day chosen and scheduled by the viewer where at the time the choice is made the viewer can choose from among multiple available times of day" is also misleading because the phrase "multiple available times of day" suggests that there is a predetermined number of times from which a viewer can select (e.g., in fifteen-minute increments, or every hour on the hour).  Nothing in the specification or prosecution history would require such a limitation.[10]  After the Markman hearing, Defendants proposed "a specific time of day chosen and scheduled by the viewer where at the time the choice is made the viewer can choose from any time of day."  Defs.' Post-Hearing Resp. 1.  The Court

---

[9]     For the same reason, the Court rejects Plaintiff's argument that the term need not be construed.  The prosecution history makes clear that the applicants gave the term a special meaning by distinguishing the patents from prior art.  Because a "requested time" could be read in the same ambiguous manner as "a time a viewer requests a program," the Court rejects the argument that the claim is clear on its face.

[10]    Defendants state that they "are not trying to limit the construction [of this term] to any particular times or time increments, e.g., 8:00, 8:15, or 8:30."  Defs.' Resp. 25 n.23. Nevertheless, the word "multiple" in this context is ambiguous in that it might suggest a finite number of choices (whether two, three, or even ten) when the system can, at least in theory, accommodate any requested time of day.

finds this construction consistent with the specification and prosecution history, as it clarifies that when the viewer selects the time, the viewer may request <u>any</u> time (including, for example, "right now").[11]

### C.  Disputed Term #3: "preventing intelligible viewing"

The third term in dispute is:

> *"preventing intelligible viewing"* ('320 Patent, Claim 1; '078 Patent, Claim 10)

- **Plaintiff's Proposed Construction: "prohibiting access by a non-requesting viewer"**

- **Defendants' Proposed Construction: "scrambling the video signal of the chosen program transmission such that the video signal displays in an incomprehensible form and transmitting the descrambling signal related to said transmission only to requesting viewers' receivers"**

Plaintiff argues that its proposed construction, "prohibiting access by a non-requesting viewer," is consistent with the specification because the patents themselves merely state that non-requesting viewers are prohibited access to programs.  While the specification offers scrambling/descrambling as an example of "preventing intelligible viewing," Plaintiff maintains that the term should not be limited to that single example.

However, the specification refers to scrambling and transmitting a descrambling signal each time "preventing intelligible viewing" is described in the patents.  <u>See, e.g.</u>, '320 Patent,

---

[11]     Plaintiff's response to Defendants' original proposal assumed that "multiple available times of day" would exclude "immediately."  <u>See, e.g.</u>, Pl.'s Reply 8 ("[A] viewer can request a program for immediate viewing and view it immediately.  Defendants' construction reads this actuality out of the scope of the claims.").  This potential ambiguity is remedied, however, by use of the word "any," as the revised construction clearly encompasses "immediately" as a possible viewing time.

2:63-3:2 ("Preferably the television transmission system is an 'addressable' system in which selected programs are scrambled to prevent intelligible viewing thereof and in which a descrambling signal can then be addressed to the receiver associated with the requesting viewer which in turn prompts the included control unit to descramble the program transmission for viewing on that receiver."); id. at 7:3-7 ("By scrambling the transmission, and by not providing a descrambling signal to other receivers, subscribers other than the requesting viewer are prevented from intelligible viewing of the chosen program.").[12]

In contrast, the only other disclosed means to prevent non-requesting viewers from viewing the transmission do not prevent intelligible viewing.  For example, communicating the specific channel number (e.g., Channel 3, Channel 10) only to the requesting viewer, as described in Claim 4 of the '320 Patent, would not prevent intelligible viewing because non-requesting viewers who inadvertently encounter the program when changing channels would be able to view it intelligibly.  See Markman Hr'g Tr. 59-60 (Plaintiff's counsel states "there could be a few other people [who] are going to get a chance to see" a program they did not request if the only means used to prevent unauthorized access was revealing the channel number only to requesting viewers).  Likewise, transmitting the signal to only one or more sections of land lines, as described in Claim 11 of the '320 Patent, would not prevent any non-requesting viewer on the section receiving the transmission from intelligibly viewing the program.  See id. at 61 (Plaintiff's counsel states that this step "would prevent the vast majority of people from getting a

---

[12]      Indeed, the "scrambling/descrambling" references occur throughout the '320 Patent.  See '320 Patent, 3:11-17; id. at 4:48-5:11; id. at 5:45-52; id. at 6:23-29; id. at 10:19-23.

look at your movie, but . . . some [on the same section] might inadvertently find out").[13]  Because claims cannot be broader in scope than the invention set forth in the specification, and because the specification consistently discloses "preventing intelligible viewing" only as scrambling and transmitting a descrambling signal, "preventing intelligible viewing" must be confined to scrambling and descrambling.  See, e.g., On-Demand Mach. Corp. v. Ingram Indus., 442 F.3d 1331, 1340 (Fed. Cir. 2006) ("[T]he role of the specification is to describe and enable the invention.  In turn, the claims cannot be of broader scope than the invention that is set forth in the specification.").[14]

Defendants' proposed construction is supported further by the prosecution history, in which the applicants clarified that scrambling is part of Claim 1 of the '320 Patent by describing Claim 2 of the '320 Patent as "more specific to the scrambling step and to the transmission of decoder signals for receipt by the receiver associated with the requesting viewer(s)."  '320 Patent, 7/6/89 Resp. to Office Action 14.  Clearly, the applicants understood Claim 2 as a more specific component of the overall "scrambling step" embodied in Claim 1.

---

[13]     At the Markman hearing, Plaintiff's counsel pointed out that a person of ordinary skill in the art would be aware of numerous ways in which "preventing intelligible viewing" can be accomplished without scrambling, such as altering the colors of the display or otherwise interfering with the picture.  Markman Hr'g Tr. 54-55.  Significantly, however, none of these alternatives is mentioned anywhere in the specification.

[14]     That the specification never explicitly limits "preventing intelligible viewing" to "scrambling/descrambling" does not render Defendants' construction improper.  In On-Demand, the Federal Circuit narrowed the ordinary definition of "customer" based on repeated references in the specification to "customer" as a retail consumer and an explanation of how the invention operated.  442 F.3d at 1339-40.  Likewise, the consistent use of "scrambling/descrambling" as the only means to prevent intelligible viewing demonstrates that the applicants, whether they were aware of other means to prevent intelligible viewing or not, limited themselves to the means cited repeatedly throughout the specification.

Plaintiff, however, argues that pursuant to the doctrine of claim differentiation, Claim 1 of the '320 Patent and Claim 10 of the '078 Patent should not be construed to have the same meanings as Claim 2 of the '320 Patent and Claim 15 of the '078 Patent, respectively.  Claim differentiation is a "presumption that an independent claim should not be construed as requiring a limitation added by a dependent claim."  Curtiss-Wright Flow Control Corp. v. Velan, Inc., 438 F.3d 1374, 1380 (Fed. Cir. 2006); see also Karlin Tech., Inc. v. Surgical Dynamics, Inc., 177 F.3d 971-72 (Fed. Cir. 1999) ("This doctrine, which is ultimately based on the common sense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope, normally means that limitations stated in dependent claims are not to be read into the independent claim from which they depend." (citation omitted)).  Because Claims 2 and 15 are dependent claims that relate specifically to the scrambling/descrambling process, Plaintiff argues that independent Claims 1 and 10 should be read more broadly and not be limited only to scrambling.

As the Federal Circuit has noted, however, claim differentiation is only a presumption, "not a hard and fast rule of construction."  Comark Commc'ns v. Harris Corp., 156 F.3d 1182, 1187 (Fed. Cir. 1998).  Moreover, "the doctrine of claim differentiation can not broaden claims beyond their correct scope, determined in light of the specification and the prosecution history and any relevant extrinsic evidence."  Multiform Desiccants, Inc. v. Medzam Ltd., 133 F.3d 1473, 1480 (Fed. Cir. 1998).  Claim differentiation does not, for example, "mean that every limitation must be distinguished from its counterpart in another claim, but only that at least one limitation must differ."  Kraft Foods, Inc. v. Int'l Trading Co., 203 F.3d 1362, 1368 (Fed. Cir. 2000).  In the instant case, Plaintiff concedes that Claim 2 of the '320 Patent contains several

limitations not found in Claim 1.  See Markman Hr'g Tr. 148 (Plaintiff's counsel states, "I acknowledge that there are a number of different means in Claim 2 . . . .").  With respect to Claim 15, it contains a means-plus-function limitation ("means for decoding a scrambled program") as well as the "scrambling" and "decoding" step.  Thus, in addition to the scrambling/decoding step, the additional means-plus-function limitation to a specific structure in the specification means that Claim 15 contains two limitations, neither of which appear in Claim 10.  Accordingly, the Court concludes that the claim differentiation presumption is unwarranted with respect to Claim 1 and Claim 10.

The Court is persuaded that Defendants' construction is correct based on examination of the specification, which consistently describes scrambling/descrambling as the only example of how to prevent intelligible viewing, and the prosecution history, in which Claim 2 is described as "more specific" to the scrambling step of Claim 1.  Accordingly, the Court will adopt Defendants' proposed construction.

### D.  Disputed Term #4: "means for selectively preventing intelligible viewing"

The fourth disputed term is:[15]

> *"means for selectively preventing intelligible viewing"* ('320 Patent, Claim 1)

• **Plaintiff's Proposed Construction:**

**Function: selectively preventing intelligible viewing**

**Structure: converter/scrambler unit 38; the portion of computer 26 which transmits decoder signals; and equivalents thereof**

---

[15]     Both parties agree that this term is drafted in "means-plus-function" form and is therefore governed by 35 U.S.C. §112, ¶ 6.

- **Defendants' Proposed Construction:**

  **Function: selectively preventing intelligible viewing**

  **Structure: the scrambler portion of conventional scrambler unit 38; a billing and address computer 26 programmed to transmit the descrambling signal only to the requesting viewers' receivers; and structural equivalents thereof[16]**

  ### 1. Whether the Preamble Is Limiting

  Plaintiff again argues that because this term is included in the preamble to the claim and serves purely informational purposes, the term is not a limitation because the body of the claim fully sets out all of the limitations of the claimed invention. For the reasons explained above, the Court rejects this argument and finds that the preamble is limiting. Accordingly, the Court will construe the disputed preamble term.

  ### 2. Function

  With respect to the function, the parties agree that the appropriate function is "selectively preventing intelligible viewing" and that the function should have the same construction as disputed term #3, discussed above. Accordingly, for the reasons discussed above, the court will construe the function "selectively preventing intelligible viewing" as "scrambling the video signal of the chosen program transmission such that the video signal displays in an incomprehensible form and transmitting the descrambling signal related to said transmission only to requesting viewers' receivers."

---

[16]     Although Defendants have submitted a proposed construction of the structure, they make the larger argument that because the specification fails to provide an algorithm for billing and address computer 26 to accomplish the recited function, the disputed term is indefinite. This argument is considered infra.

### 3. Corresponding Structure

With respect to the structure, the parties agree that the corresponding structure includes at least a portion of converter/scrambler unit 38 and billing and address computer 26.  As explained in the '320 Patent, unit 38 scrambles program transmissions, and computer 26 transmits decoder signals, thereby preventing intelligible viewing by all but the proper subscribers.  However, the parties disagree on exactly how much of unit 38 and computer 26 are corresponding structure.

Defendants argue that only the portion of billing and address computer 26 responsible for sending "descrambling signals" is the corresponding structure and that Plaintiff's proposed structure, "the portion of computer 26 that transmits decoder signals," is overly broad.  The Court agrees.  The specification describes "decoder signals" as including both (a) address signals and (b) descrambling signals.  '320 Patent, 4:63-68 ("Computer 26 is operable to transmit decoder signals . . . which allows intelligible viewing of scrambled program transmission on selected ones of receivers 16 and prevents intelligible viewing on others."); id. at 6:60-66 ("Computer 28 . . . also interacts with computer 26 so that computer 26 sends appropriate decoder signals . . . . The decoder signals include address signals . . . .").  Throughout the specification, it is clear that address signals and descrambling signals are distinct.  See, e.g., id. at 5:4-5 ("Descrambling signals are typically associated with the address signals . . . .").  Yet only the descrambling signal "prompts . . . receiver 16 to descramble the transmissions identified by the associated descrambling signal."  Id. at 5:4-7; see also id. at 5:7-11 ("Receivers 16 which do not receive descrambling signals associated with their respective address signals prevent intelligible viewing of the scrambled program transmission.").  Because computer 26 must send "descrambling signals" and not necessarily "decoder signals" to perform the identified function, the

corresponding structure is narrower than Plaintiff's proposed construction.  See, e.g., Asyst

Techs., Inc. v. Empak, Inc., 268 F.3d 1364, 1370 (Fed. Cir. 2001) ("Structural features that do

not actually perform the recited function do not constitute corresponding structure and thus do

not serve as claim limitations.").

     The Court also agrees with Defendants' identification of the corresponding structure in

unit 38.  As explained in the specification, converter/scrambler unit 38 provides two functions.

First, it receives and converts signals for output on a predetermined frequency channel.  '320

Patent, 4:48-50.  Second, it is "operable to selectively scramble program transmissions."  Id. at

4:56-57.  For the reasons discussed above in construing claim #3, converting signals for output

on a predetermined frequency channel is not "preventing intelligible viewing."  See Markman

Hr'g Tr. 164 (Defendants' counsel explains that "[t]he converter serves the purpose of essentially

designating which channel the broadcast is going to occur on so you convert the video program

to a frequency associated with the channel it's going to be broadcast on.  It has nothing to do with

preventing intelligible viewing, it's the question of whether it's going to be on Channel 2,

Channel 4, Channel 8, [or] Channel 10").  Therefore, because the only portion of unit 38 required

to prevent intelligible viewing is the scrambler portion, the scrambler portion is the only

corresponding structure.

### 4.  Indefiniteness

     Lastly, in the final three pages of their claim construction brief, Defendants for the first

time raise the argument that Claim 1 of the '320 Patent is deficient because it does not disclose

sufficient structure with respect to billing and address computer 26.  They point out that when the

corresponding structure is a general use computer, such as computer 26, the law requires that the

algorithm (i.e., the specific sequence of steps that are performed to carry out each function) performed by this computer be disclosed.  See WMS Gaming Inc. v. Int'l Game Tech., 184 F.3d 1339, 1349 (Fed. Cir. 1999) ("In a means-plus-function claim in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm.").  Defendants argue that the billing and address computer 26 must send a descrambling signal and that there is nothing within the four corners of the patent to specify how to make computer 26 operable to address the descrambling signal to only the requesting viewers to selectively prevent intelligible viewing.  Accordingly, they maintain that by failing to disclose the algorithm, the patentees have failed to satisfy the quid pro quo of using a means-plus-function claim, rendering the term indefinite.

The Court declines Defendants' invitation to rule on the validity of Claim 1 at this time because the briefing on both sides of this issue is inadequate to render a proper decision.  As made clear in the parties' briefs and at the Markman hearing, the indefiniteness argument was raised only after the parties engaged in numerous meetings and filed a joint statement of claim construction with the Court.[17]  Thus, Plaintiff was able to address the argument only within the seven-day reply period established by the Court's scheduling order.[18]  Given the importance of

---

[17]     The Joint Statement of Claim Construction contained Defendants' proposed construction of this term.  Notably absent from this proposed construction is any suggestion that the structure is indefinite.  See Defs.' Proposed Claim Constructions 2, attached to Joint Claim Construction and Prehearing Statement at Ex. B.

[18]     Indeed, owing to the tardiness of Defendants' argument, the entirety of Plaintiff's reply brief is dedicated to arguing why the Court should not address the indefiniteness argument at this stage.  Only two slides of Plaintiff's Markman presentation even address the merits of the argument.  Accordingly, the Court is left with very little in the way of a discussion of

this argument—which would invalidate Claim 1 altogether—the Court declines to rule on a

critical issue that Defendants raised only at the final hour and only in the final few pages of a

forty-page claim construction brief.  Defendants had ample time to identify and research this

issue since the Court's initial claim construction scheduling order, and Plaintiff shall have

sufficient time to respond to Defendants' contention.[19]


## IV.  CONCLUSION

For the reasons discussed above, the Court will adopt the constructions as stated in the

accompanying Order.

---

Defendants' argument on the merits.

[19]      Numerous courts have declined to address indefiniteness arguments at the claim
construction stage and have deferred such rulings until the summary judgment stage.  See, e.g.,
Presidio Components, Inc. v. Am. Tech. Ceramics Corp., 2008 U.S. Dist. LEXIS 46460, at *10
(S.D. Cal. June 11, 2008) ("As an initial matter, the Court declines to address ATC's
indefiniteness argument at this point with respect to this and other disputed terms and concludes
such analysis would be more appropriate at the summary judgment stage."); Kowalski v. Ocean
Duke Corp., 2007 U.S. Dist. LEXIS 85481, at *8 (D. Haw. Nov. 19, 2007) ("Indefiniteness must
be demonstrated by clear and convincing evidence, however, and is not appropriate during claims
construction." (citation omitted)); Intergraph Hardware Techs. Co. v. Toshiba Corp., 508 F.
Supp. 2d 752, 773 n.3 (N.D. Cal. 2007) ("The parties appear to agree on the corresponding
structure, though Toshiba argues that the structure is too indefinite.  This indefiniteness argument
is inappropriate at the claim construction stage."); Pharmastem Therapeutics, Inc. v. Viacell Inc.,
2003 U.S. Dist. LEXIS 877, at *2 n.1 (D. Del. Jan. 13, 2003) ("Consistent with the court's oral
ruling during the Markman hearing on January 10, 2003, the court will not address the
defendants' indefiniteness argument at this stage of the proceedings.").  The Court believes that
deferring this ruling until a later stage is particularly appropriate here, given the lack of adequate
briefing from either party.  Although a finding of indefiniteness for failure to disclose adequate
structure "is a legal conclusion that is drawn from the court's performance of its duty as the
construer of patent claims," Biomedino, LLC v. Waters Techs. Corp., 490 F.3d 946, 949 (Fed.
Cir. 2007) (internal quotation marks omitted), the Court declines to reach a premature legal
conclusion and instead elects to defer this issue until the summary judgment stage.