# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: VTRAN MEDIA TECHNOLOGIES  :  MDL Docket No. 1948
LLC, PATENT LITIGATION  :
 :

## MEMORANDUM ON SUMMARY JUDGMENT

Baylson, J.                                                    September 17, 2010

     This multi-district litigation involves numerous patent infringement actions that Plaintiff

VTran Media Technologies, LLC ("VTran") commenced throughout the United States.[1]  On June

10, 2008, the Judicial Panel on Multidistrict Litigation coordinated and consolidated these

actions for pretrial proceedings before now retired Judge Bruce Kauffman in this Court pursuant

to 28 U.S.C. § 1407.  VTran alleges, inter alia, that Defendants,[2] who are cable television

providers, offered "video on demand" services ("VOD services") that purportedly infringe upon

VTran's two patents—U.S. Patent No. 4,890,320 (filed Jun. 9, 1988) ("the '320 Patent") and

U.S. Patent No. 4, 995,078 (filed Oct. 10, 1989) ("the '078 Patent," collectively with the '320

---

[1]Ten open cases have been consolidated for coordinated pretrial proceedings, including nine transferred to this District.  (Nos. 08-0477, 08-3047, 08-3049, 08-3050, 08-3051, 08-3313, 08-3314, 08-3316, & 08-3703.)  Six additional cases previously consolidated for pretrial proceedings have been closed.  (Nos. 08-3048, 08-3052, 08-3500, 08-3762, & 08-3764.)

[2]As of the filing of this Memorandum, the following nineteen companies are listed as Defendants:  Armstrong Utilities, Inc.; Astound Broadband LLC; Blue Ridge Cable Technologies, Inc.; Bright House Networks, LLC; Buckeye Cablevision, Inc.; Cablevision Systems Corp.; Charter Communications; Comcast Corp.; Cox Communications, Inc.; Gans Communications, L.P.; Harron Communications, L.P.; Insight Communications, Co.; Massillon Cable TV, Inc.; Mediacom Communications Corp.; Midcontinent Communications; Time Warner Cable, Inc.; Wave Broadband LLC; WideOpenWest Cleveland, Inc.; and WideOpenWest Finance, LLC.

Patent, "VTran Patents" or "the Patents").[3]  In short, the VTran Patents, titled "Television Broadcast System for Selective Transmission of Viewer-Chosen Programs at Viewer-Requested Times" and which have virtually identical specifications, describe "an invention that allows multiple viewers to view the same transmission of a program at the same time."  In re VTran Media Techs., 2009 WL 2169155 (July 17, 2009) (Kauffman, J.) ("VTran I").

On July 17, 2009, Judge Kauffman construed the disputed claim terms in the VTran Patents pursuant to Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed. Cir.1995) (en banc), aff'd 517 U.S. 370.  Id.  Subsequently, this case was reassigned to the undersigned.  (ECF No. 60.)  On October 15, 2009 VTran moved to allow discovery.  (ECF No. 63.)  Although Defendants opposed VTran's motion, inter alia, on the basis that the Markman claim constructions support summary judgment, rendering VTran's infringement contentions "fatally flawed" (ECF No. 64, at 3–10), the Court granted in part VTran's Motion to Allow Discovery (ECF No. 67), which authorized written discovery, i.e., interrogatories, requests for documents, and requests for admissions.  Defendants apparently objected to certain discovery.  The Court scheduled a hearing on the discovery disputes, but the parties resolved all issues before the hearing.  No other motion to compel pursuant to Federal Rule of Civil Procedure 37  has been filed.  (See Summ. J. Hr'g Tr. 56:5-10, Aug. 26, 2010, ECF No. 94.)

Presently before the Court is Defendants' Motion for Summary Judgment of Non-Infringement (ECF No. 80), filed on May 21, 2010, which contends that the VOD services that Defendants offer are not covered by, and thus, do not infringe upon, the VTran Patents (ECF No.

---

[3]On October 10, 1989, during the pendency of the patent application for the '320 Patent, which was issued on December 26, 1989, the inventors filed the patent application for the '078 Patent was issued on February 19, 1991.

80).  On August 13, 2010, the Court heard oral argument on the Motion.  (ECF No. 94.)  For the reasons that follow, the Court is inclined to grant Defendants' Motion, but will give VTran an opportunity to submit an affidavit pursuant to Federal Rule of Civil Procedure 56(f), that explains the need and scope of the additional discovery it requests.

## I.      Legal Standards

### A.      Summary Judgment

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  Id. _____

_____A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion, and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  When the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case."  Id. at 325. After the moving party has met its initial burden, the adverse party's response must, "by affidavits or as otherwise provided in [Federal Rule of Civil Procedure 56] set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e).  Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the

existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.  Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party.  Anderson, 477 U.S. at 255.

      **B.**      **Patent Infringement**

"Determining whether a patent claim has been infringed involves two steps:  (1) claim construction to determine the scope of the claims, followed by (2) determination whether the properly construed claim encompasses the accused structure." Bai v. L & L Wings, Inc., 160 F.3d 1350, 1353 (Fed. Cir. 1998); see also Markman, 52 F.3d at 976.  As already noted, in this case, the first step has been completed.  A patent owner may establish infringement under one of two theories:  literal infringement or the doctrine of equivalents.  See id.

The first of the two theories, literal infringement, requires "every limitation in a patent claim [to be] found in an accused product, exactly." Southwall Techs., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1575 (Fed. Cir. 1998).  "A literal infringement issue is properly decided upon summary judgment when no genuine issue of material fact exists, in particular, when no reasonable jury could find that every limitation recited in the properly construed claim either is or is not found in the accused device." Bai, 160 F.3d at 1353.

In contrast, "[i]nfringement may be found under the doctrine of equivalents if every limitation of the asserted claim, or its 'equivalent,' is found in the accused subject matter, where an 'equivalent' differs from the claimed limitation only insubstantially." Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp., 149 F.3d 1309, 1315 (Fed. Cir. 1998).  In performing the infringement analysis pursuant to the doctrine of equivalents, a court may consider "[w]hether a

4

component in the accused subject matter performs substantially the same function as the claimed

limitation in substantially the same way to achieve substantially the same result." Id.  At its core,

"[t]he doctrine of equivalents allows the patentee to claim those insubstantial alterations that

were not captured in drafting the original patent claim but which could be created through trivial

changes." Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 535 U.S. 722, 733 (2002).

"When, however, the patentee originally claimed the subject matter alleged to infringe but

then narrowed the claim in response to a rejection," prosecution history estoppel bars the

patentee from "argu[ing] that the surrendered territory comprised unforeseen subject matter that

should be deemed equivalent to the literal claims of the issued patent." Id. at 733-34.  "Were it

otherwise, the inventor might avoid the PTO's gatekeeping role and seek to recapture in an

infringement action the very subject matter surrendered as a condition of receiving the patent."

Id. at 734.  In such cases, "the amendment a patentee makes to a patent narrows the patent's

scope and may be presumed to be a general disclaimer of the territory between the original claim

and the amended claim," and "the patentee . . . bear[s] the burden of showing that the amendment

does not surrender the particular equivalent in question.  Id. at 740.  The Supreme Court has

recognized three situations in which "the patentee can overcome the presumption that

prosecution history estoppel bars a finding of equivalence": (1) "The equivalent [was]

unforeseeable at the time of the application," (2) "the rationale underlying the amendment . . .

bear[s] no more than a tangential relation to the equivalent in question," or (3) "some other

reason suggest[s] that the patentee could not reasonable be expected to have described the

insubstantial substitute in question." Id. at 740-41.  "The determination of infringement under

the doctrine of equivalents [is a] question[] of law." Panduit Corp. v. HellermannTyton Corp.,

451 F.3d 819, 826 (Fed. Cir. 2006).

## II.    **Markman** Decision

During the claim construction stage of this litigation, the parties disputed four claim term,

two of which are relevant to the pending Motion for Summary Judgment of Non-Infringement.[4]

The following chart sets forth the two relevant disputed claim terms[5] and the constructions Judge

Kauffman adopted:

| Disputed Claim Term | Adopted Construction |
|---|---|
| "a viewer-requested time," '078 Patent, col. 13, 13, l. 23; col. 14, ll. 2, 6 (Claim 10), or "requested time," '320 Patent, col. 10, ll. 51, 55-56, 60 (Claim 1) | "a specific time of day chosen and scheduled by the viewer where at the time the choice is made the viewer can choose from any time of day" (Defendants' modified construction) |
| "a television transmission system for transmitting programs thereover for reception by a plurality of receivers," '078 Patent, col. 13, ll. 12-14 (Claim 10 Preamble); see also '320 Patent, col. 10, ll. 34-37 (Claim 1 Preamble) | "a system that allows multiple viewers to choose the same program at the same time such that once the chosen program is scheduled for transmission on a particular channel, additional viewers can be added by transmitting the appropriate descrambling signals to the requesting viewer's receiver" (Defendants' construction) |

The Court asked VTran's counsel at the summary judgment hearing, "whether any

discovery that you have taken, you believe warrant a reopening of the Markman issues." (Summ.

J. Hr'g Tr. 5:16-17.)  VTran, however, did not answer this question in the affirmative either at

the hearing or in its supplemental brief to the Court.  Because VTran has not requested

---

[4]In addition to the two claim terms detailed in this section, the parties disputed, and Judge Kauffman construed the claim terms "preventing intelligible viewing," '078 Patent, col. 14, l. 5; '320 Patent, col. 10, ll. 41-42, 59 (Claim 1); and "means for selectively presenting intelligible viewing," '320 Patent, col. 10, ll. 41-42 (Claim 1).  See VTran I, 2009 WL 2169155, at *8-11.

[5]The parties agreed that although each disputed claim term was phrased differently in the two VTran Patents, each had a single meaning that governed both Patents.  See VTran I, 2009 WL 2169155, at *4 n.4, 7 n.7.

reconsideration of the claim constructions in light of discovery, and because Judge Kauffman's reasoning, which is detailed below, is amply supported by the intrinsic record, the Court sees no reason to disturb his claim constructions.

### A.   "Viewer-Requested Time"

Turning first to "viewer-requested time" and "requested time," Judge Kauffman determined that "[t]he prosecution history makes clear that the applicants gave the term a special meaning by distinguishing the patents from prior art." Id. at &7 n.9.  Judge Kauffman found that VTran oversimplified the terms in its proposed construction of "the time a viewer requests a program." Id. at *7.  Judge Kauffman reasoned that the VTran Patents involved two "times," "the time that a request is made," and "the time scheduled by the viewer for the transmission of the chosen program to begin." Id.  Judge Kauffman then found that the specification of the '320 Patent differentiated the VTran Patents from "prior art that did 'not allow the viewer to determine when the program is to be scheduled," id. (quoting '320 Patent, col. 2, ll. 42-43), which the applicants expressly described as "schedul[ing] transmission times (a) by the provider only (meaning that viewers could never schedule the time of the program), or (b) on-demand (meaning that programs are transmitted as soon as possible after the viewer requests the program, but viewers cannot schedule the program at a later, specific time)." Id.

Judge Kauffman, however, also declined to adopt Defendants' initial proposed construction that specified that "the viewer can choose from among multiple available times of day," "misleading[ly] . . . suggests that there is a predetermined number of times from which a viewer can select (e.g., in fifteen-minute increments, or every hour on the hour)," a limitation unsupported by the intrinsic evidence when "the system can, at least in theory, accommodate any

requested time of day," which "clearly encompasses 'immediately' as a possible viewing time." Id. at *8, 8 nn.10, 11 (emphasis added).  Judge Kauffman therefore adopted Defendants' subsequent proposal that modified their initial construction by clarifying that "the viewer can choose from any time of day."  Id. at *8 (emphasis added).

## B.    "Television Transmission System"

The "television transmission system" claim term appears in the preamble to Claim 1 of the '320 Patent and Claim 10 of the '078 Patent.  VTran contended that the claim preambles in question, rather than limiting the claims, were only informational by clarifying that the claimed methods are to be performed within preexisting cable television systems, and thus, the claim term should be construed "simply as 'a system for transmitting programs to receivers.'"  VTran I, 2009 WL 2169155, at *4, 6.  Judge Kauffman disagreed, finding that the preambles "recite[] essential structure—'a' television transmission system'—that . . . later . . . method claims" repeatedly refer to as "the system" in describing the invention.  Id. at *4–5.  Judge Kauffman therefore concluded that the preambles "give[] meaning to the claim itself," without which, later references in the patent to "the system" would be "meaningless."  Id. at *4–5.

Accordingly, in construing the "television transmission system" claim term, Judge Kauffman determined that the specification of the '329 Patent "imparts a special meaning to the term" by describing the "present invention" as "allow[ing] multiple viewers to view the same transmission of a program at the same time," id. at *6 (citing '329 Patent, col. 10, ll. 9-19), as embodied in Defendants' proposed construction.  In addition, Judge Kauffman found additional support for Defendants' construction in the prosecution history of the '320 Patent, in which the applicants "distinguished their invention from a prior art reference" on the basis that through the

use of "appropriate descrambling signals to requesting viewers," "'the applicants' system allows many viewers . . . to choose the program for viewing at the same time.'" Id. at *6-7 (quoting '320 Patent, 7/6/89 Resp. to Official Action at 8 (emphasis removed)).  Judge Kauffman then adopted Defendants' proposed construction.  Id. at *7.

## III.    Discussion

In moving for summary judgment, Defendants assert two bases purportedly indicating that none of their VOD services infringed, either literally or under the doctrine of equivalents, upon the VTran Patents:  that the accused VOD services do not meet the VTranPatents' (1) "requested time" limitation, or (2) "television transmission system" limitation.  (Def.'s Summ. J. Mot. 1.)  The Court will address each in turn.

### A.      "Requested Time" Limitation

The Court will turn first to whether VTran can demonstrate that Defendants infringed upon their Patents by meeting the "requested time" limitation under a theory of literal infringement, before examining whether VTran can show infringement under the doctrine of equivalents.

#### 1.      Literal Infringement

##### a.      The Parties' Contentions

For literal infringement of the "requested time" limitation, Defendants aver that undisputedly, their VOD services "are 'on-demand' services that solely transmit a selected program immediately after the viewer requests that program," and that the viewer has no "ability to choose and schedule a time of day for the transmission of that program," such as "arriv[al] in the future or at a later, specific time."  (Def.'s Summ. J. Mot. 8 (some internal quotation marks

omitted); see also Def.'s Summ. J. Reply 4.)  According to Defendants, their accused products have the same immediate viewing-only feature of prior art "on-demand" services differentiated by VTran during the prosecution history of the Patents.  (Def.'s Summ. J. Mot. 10.)  Defendants argue that a contrary conclusion is not warranted merely because their VOD services permit a viewer to "re-watch a previously-purchased program as many times as desired within the [24-hour] time period [after first ordering the program] without having to pay any additional fee," because a "subsequent request to view a particular program," even within that 24-hour time period, "represents a first-time request or a subsequent request to view a particular program" that is "separate from and independent of any previous transmissions of the program" and still "begins immediately."  (Defs.' Summ. J. Mot. 11, 13.)  Defendants assert that the only difference between subsequent requests to view a previously-purchased program within 24 hours of the prior purchase, and requests after the 24 hours have elapsed, is that the former are not charged an additional rental fee, meaning that the "24 hour period is solely for billing purposes."  (Defs.' Summ. J. Mot. 12-13.)

VTran responds that Defendants have misapplied the Court's construction of "requested time" and the doctrine of prosecution history estoppel, because at no point did the applicants disclaim "ordering a program that arrives immediately," as Judge Kauffman acknowledged. (Summ J. Resp. 23.)  In particular, VTran avers that upon purchasing a program, a viewer using the accused products can now "choose from any time of day over the next 24 hours," the "functional period in which a program is made available to a viewer from the time of his initial selection," to "view the program again," therefore allowing the viewer to choose and schedule a specific time of day to view the program.  (Summ. J. Resp. 24-26.)  According to VTran, such a

conclusion is supported by the fact that the menu option accompanying an already purchased program during the 24 hour period indicates that such program is "IN-PROGRESS" or "CURRENTLY SELECTED."  (Summ. J. Resp. 26.)  Moreover, VTran contends that rather than constituting new and separate transmissions that are assigned unique Stream IDs, subsequent requests to view a program purchased in the preceding 24 hours, Defendants' exhibits demonstrate that such transmissions fall within the "current open session established at the original transmission."  (Summ. J. Resp. 28.)  VTran concludes that these facts, which are supported by the declaration of its expert, Dr. Steve Smoot, demonstrate that there are material facts in dispute, thus precluding summary judgment relief.  (Summ. J. Resp. 24.)

### b.       Analysis

The parties largely dispute whether Defendants' accused services enable a viewer to "choose" and "schedule" a "specific time of day" to view the selected program.  Turning first to "choice," during the period when a program is available, a viewer can choose to purchase the program at any time, and can rewatch the program at no additional fee during the subsequent 24 hour period.  Even though a viewer cannot program Defendants' VOD services to begin or resume the program automatically at a specific, later time, viewing the evidence in the light most favorable to VTran, a jury reasonably could conclude that a viewer can choose to purchase the program at any time of day, that being the time of day when he or she decides to navigate through the menu and completes the steps for purchasing the program.

In contrast, Defendants' VOD systems do not permit a user to "schedule" a particular viewing time, as required by the construction of "requested time," insofar as "schedule" indicates that the VOD systems can be programmed by the viewer to show the program at a later, specific

time.  Although viewers retain the ability to view a purchased program at no additional cost at

any point during the 24 hours following the purchase, this does not meet the definition of

"schedule," which Merriam-Webster Collegiate Dictionary describes as "to appoint, assign, or

designate for a <u>fixed time</u>."  Merriam-Webster Collegiate Dictionary 1041 (10th ed. 1995)

(emphasis added).  There is a distinction between choosing a window of time in which a program

can be viewed, and communicating to the viewing program a later time when the user intends to

watch the program.  In light of this distinction, VTran cannot set forth a literal infringement

claim respecting the requested time claim limitation, because it cannot show that "every

limitation in [its] patent claim" has been "found in [Defendants'] accused product[s], <u>exactly</u>."

<u>Southwall</u>, 54 F.3d at 1571.

Moreover, the prosecution history indicates that the applicants distinguished prior on-

demand programs that did not permit more than immediate viewing, i.e., "cannot schedule the

program at a later, specific time."  <u>VTran I</u>, 2009 WL 2169155, at *7.  As a result, a jury could

not reasonably conclude that Defendants' VOD services literally infringed upon the VTran

Patents.[6]

### 2.     Doctrine of Equivalents

#### a.     The Parties' Contentions

Defendants contend that VTran has only "obliquely allege[d] that each Defendant has

---

[6]The parties also dispute whether the 24 hours following the selection of a program is merely a period for billing purposes, meaning that subsequent viewing of programs during that period are separate requests, as Defendants contend, or an "open session" as VTran avers.  The Court need not reach this issue, because as already explained, Defendants' on-demand programs do not permit "scheduling" as defined in the Patent, and thus, VTran cannot establish direct infringement.

practiced, currently practices, and/or can practice this 'requested time' step under the doctrine of equivalents," but has failed to serve an "articulable explanation" of its doctrine of equivalents infringement contentions, as required under Northern District of California Local Patent Rule 3-1. (Defs.' Summ. J. Mot. 14, 14 n.1.)  Defendants then aver that prosecution history estoppel bars the application of the doctrine of equivalents, because VTran disclaimed coverage of the "very 'on-demand' systems" offered by Defendants in order "to secure issuance of the asserted claims." (Summ J. Mot. 15.)  Finally, Defendants reassert that because "the accused VOD services do not provide viewers a choice of later times of day for viewing a program" upon purchasing a program, a finding that their services infringe the VTran Patents would "entirely eliminate 'requested time' as a limitation in the claims," which is impermissible. (Defs.' Summ. J. Mot. 15-16.)

In responding to Defendants' arguments, VTran reasserts its arguments that it did not broadly disclaim coverage of immediate-viewing services during the Patents' prosecution history, and that Dr. Smoot's "unopposed" expert opinion indicates that "Defendants' VOD systems have the same function and result as the claimed 'requested time.'" (Summ. J. Resp. 33-35 (emphasis removed).)

### b.    Analysis

Although Defendants' accused devices do not permit "scheduling" insofar as scheduling allows users to input into the on-demand services a fixed time to automatically view selected programs, what is less clear is whether they nonetheless are "equivalent" to the services covered by the VTran Patents.  In arguing that the differences between the choice and scheduling features of the systems covered by the VTran Patents and the accused VOD services are insubstantial,

13

VTran relies on the declaration of its expert, Dr. Smoot.

A plaintiff can prove structural equivalence by way of the "function-way-result test." Applied Med. Resources Corp. v. U.S. Surgical Corp., 448 F.3d 1324, 1334 (Fed. Cir. 2006).

"Infringement analysis under the doctrine of equivalents proceeds element-by-element; a generalized showing of equivalency between the claim as a whole and the allegedly infringing product or process is not sufficient to show infringement." Abbott Labs. v. Sandoz, Inc., 566 F.3d 1282, 1296 (Fed. Cir. 2009). A plaintiff can show equivalency by meeting the "primary test for equivalency," which is the "'function-way-result' or 'triple identity' test, whereby the patentee may show an equivalent when the accused product or process performs substantially the same function, in substantially the same way, to achieve substantially the same result, as disclosed in the claim." Id. Accordingly, in performing the function-way-result test, the court must "first determine that the accused and disclosed structures perform the identical functions," and then, compare " the way in which these functions were performed by the two structures," and the "results" of the services, to determine whether the functions, ways, and results, are substantially the same. Applied Med. Resources Corp. v. U.S. Surgical Corp., 448 F.3d 1324, 1334 (Fed. Cir. 2006); see also Malta v. Schulmerich Carillons, Inc., 952 F.2d 1320, 1327 n.5 (Fed. Cir. 1991).

Turning first to function, drawing all factual inferences in favor of VTran, the non-movant, a jury could conclude that the services covered by the VTran Patents and the accused services have the same function of allowing the viewer to choose the time of day to view a selected program. The specification of the Patents explain that the covered services differ from prior art that did "not allow the viewer to determine when the program is to be scheduled." '320

14

Patent, col. 2, ll. 42-43.  Moreover, as Judge Kauffman explained in his <u>Markman</u> decision, in

prosecuting the VTran Patents, the applicants only distinguished prior art for which the "viewers

could never schedule the time of the program," and on-demand programs in which the programs

"are transmitted as soon as possible after the viewer requests the program."  <u>VTran I</u>, 2009 WL

2169155, at *7 (citing '078 Patent, 5/21/90 Resp. to Office Action at 9-10).  Such intrinsic

evidence demonstrates that the VTran Patents aimed to allow viewers to choose the time for

immediate or future viewing.  Similarly, the accused products permit viewers to choose later

times for viewing the program at the time the request is made, because viewers can resume or re-

watch the chosen program in the 24 hours following the initial selection, as Smoot opined in his

declaration.  (Smoot Decl. ¶ 100.)

  As for the "way" in which the VTran Patents and accused products carry out the function,

the Patents permit the viewer to schedule any particular present or future time for viewing,

whereas Defendants' on-demand services allow a user to "have access to the programming" at

any time within the 24 hours following the purchase of a program.  (Smoot Decl. ¶ 102.)  As a

result, the accused products "allow a user to select a program and purchase or initiate it without

intended to view it at the instant it is initiated," but to plan to, and in fact, view the program at a

later, more convenient time.  (Smoot Decl. ¶ 102.)  While these systems do not have the identical

means as the VTran Patents, a jury could conclude reasonably, as did Dr. Smoot, that the

differences in means are insubstantial.

  The end result in the services covered by the VTran Patents and Defendants' services, is

that the user can view a selected program at any particular time of day of the user's choosing,

which allows users to "enjoy [] the benefits of shifting their viewing just as was contemplated by

the [VTran] [P]atents," (Smoot Decl. ¶ 103).  Although the accused products "may or may not be given the option to input a future time to receive the program they select," they are "easily able to produce the same result."  (Smoot Decl. ¶ 102.)  Accordingly, VTran has demonstrated that a jury could conclude reasonably that the functions, ways, and results of the accused products and the technology covered by the VTran Patents are substantially the same, with only inconsequential differences.

Moreover, contrary to Defendants' contention that Dr. Smoot's declaration is "conclusory" (Defs.' Supp. Br. 2, ECF No. 97),[7] the Court cannot conclude at this time that Dr. Smoot's statements fail to provide the necessary "particularized testimony and linking arguments" from which a jury could conclude that VTran proved infringement under the doctrine of equivalents.  Dr. Smoot's declaration detailed the function, way, and result of the viewer-requested time feature of Defendants' on-demand services, and compared these to those described in the VTran Patents.  (Smoot Decl. ¶¶ 20, 42-47, 100-103.)  His declaration, thus, is not wholly conclusory by providing "unsupported conclusion[s] on the ultimate issue of infringement," that cannot set forth an infringement claim.  Arthur A. Collins, Inc. v. N. Telecom Ltd., 216 F.3d 1042, 1046 (Fed. Cir. 2000); see also Novartis Corp. v. Ben Venue Labs., Inc.,

---

[7]Although the Court asked VTran to find precedent regarding whether "an expert's fairly conclusory opinion, which is what we have here, has been found to be sufficient to deny summary judgment" (Summ J. Hr'g Tr. 58:7-10, Aug. 26, 2010, ECF No. 94), can be permitted under the doctrine of equivalents, the Court nonetheless reserved judgment and had not intended to convey a finding that Dr. Smoot's declaration was so conclusory that it could not be considered as supporting VTran's contentions concerning the existence of a factual issue that precludes summary judgment with respect to the requested time limitation.  The Court must note that Dr. Smoot's declaration "saved the day" for VTran, as the oral argument colloquy disclosed that VTran's counsel continually evaded answering the Court's questions focusing on specific differences between VTran's patented system and Defendants' quite different on-demand services.  (See Hr'g Tr. 13-25.)

271 F.3d 1043, 1050 (Fed. Cir. 2001) (affirming the district court's decision to not credit "wholly deficient and empirically groundless" expert affidavits).

In addition, prosecution history estoppel does not apply to prevent VTran from claiming patent infringement against Defendants' on-demand services respecting the "requested time" claim limitation, under the doctrine of equivalents.  VTran did not disclaim coverage over services such as Defendants', that permit a viewer to watch a program immediately but also re-watch or resume the program at any time of the viewer's choosing in the 24 hours following the initial purchase; instead, VTran distinguished in the prosecution history only prior art which did not permit viewers to schedule the program time or transmitted the program as soon as possible after the request is made.  See VTran I, 2009 WL 2169155, at *7.  Accordingly, by asserting that the accused products are "equivalent to the literal claims" of its Patents, VTran is not impermissibly "seek[ing] to recapture . . . the very subject matter surrendered as a condition of receiving the patent," Festo, 535 U.S. at 734.  Thus, the Court is not prepared to award summary judgment to Defendants on the basis that the accused products cannot be found to have infringed upon the VTran Patents' "requested time" claim limitation under the doctrine of equivalents.

**B.**     **"Television Transmission System" Limitation**

**1.**     **Literal Infringement**

**a.**     **The Parties' Contentions**

For literal infringement of the "television transmission system" limitation, Defendants aver that unlike the invention covered by the VTran Patents, Defendants' accused VOD services do not "allow additional requesting viewers to be added to a transmission by transmitting appropriate descrambling signals." (Summ J. Mot. 16.)  Instead, Defendants assert that their

17

services create "a new and separate transmission in response to each request to view a program," as evidenced by the fact that each such transmission has a unique "'Stream ID' (or equivalent, such as 'Stream Handle')" that "identifies each stream on a video server so that VCR-like functionality, such as fast forward, rewind, or pause, can be applied to the proper stream." (Defs.' Summ. J. Mot. 16-17.)  According to Defendants, VTran's contention that "QAM tuner[s]," a device that the Court will detail below, permit additional viewers to access a user's transmission on Defendants' VOD services, is "absurd," given that such a theory "relies on a 'hacker' or unauthorized viewer stealing VOD services."  (Defs.' Summ. J. Mot. 17-18.)  Defendants continue that such a theory "completely fails to describe a system that meets the Court's definition of 'television transmission system,'" because the hacker has "failed to ask the VOD provider for authorized access to a program," and was only able to access the transmission because the transmission was <u>not</u> scrambled," as required by the Court's construction of the claim term.  (Defs.' Summ. J. Mot. 18.)

VTran responds that Defendants' "reasoning completely ignores the physical architecture of their hybrid fibre-coaxial networks," which is that "[e]very subscriber within a node will receive every transmission sent from the headend on that node," including on-demand transmissions, although "only the requesting viewer can have the VCR-like control over the transmission and only a viewer who can find the dynamically assigned virtual channel that the program is being displayed on can view it."  (Pl.'s Summ. J. Resp. 30-31.)  VTran continues that "[t]hrough the use of a QAM tuner," which is neither illegal nor unauthorized, and is in fact described on two of Defendants' own websites, "a viewer can access all cable programming that is being transmitted through to his home," although the tuner is not "able to read the signal

18

providing the dynamically assigned virtual channel."  (Pl.'s Summ. J. Resp. 31; <u>see also</u> Summ.

J. Hr'g Tr. 30-36.)  VTran thereby concludes that Defendants' VOD systems, like the invention

covered by the VTran Patents, allow "multiple viewers to choose the same program at the same

time."  (Pl.'s Summ. J. Resp. 31; <u>see also</u> Summ. J. Hr'g Tr. 59:21-23.)  Finally, VTran contends

that a genuine issue of material fact exists as to the capabilities of the accused systems, that being

whether Defendants' products always have the capacity to allow users to have their own streams.

(Pl.'s Summ. J. Resp. 32.)

**b.       Analysis**

Judge Kauffman construed the claim term "television transmission system" in the VTran

Patents as allowing "additional viewers [to] be added by using appropriate descrambling signals"

so that only authorized viewers can view a program.  <u>VTran I</u>, 2009 WL 2169155, at *4.  In so

finding, Judge Kauffman examined the prosecution history, in which applicants distinguished

their product from prior art that did not use descrambling signals to allow only authorized

viewers to watch the chosen program, and did not allow "additional, simultaneous" viewers to be

added to an existing channel.  <u>Id.</u> at *6-7 (internal quotation marks omitted).  At no point has

VTran contended that the accused products use descrambling signals to prevent unauthorized

viewing or that the accused products can add viewers to an existing transmission.  (<u>See</u> Pl.'s

Summ. J. Resp. 31-32 ("[Defendants] argue that their systems do not add viewers to a current

transmission.  That may be true.").)

Instead, VTran contends that the accused products permit multiple viewers to access

Defendants' on-demand services, thereby satisfying the television transmission claim limitation

of the VTran Patents.  (Summ J. Resp. 31.)  Dr. Smoot's declaration explains that "QAM" stands

19

for "'quadrature amplitude modulation,' the format by which digital cable channels are encoded and transmitted via cable." (Smoot Decl. ¶ 8.) According to Dr. Smoot, "[a] QAM capable receiver has the ability to receive and demodulate [the QAM] signal format" (Smoot Decl. ¶ 7), allowing "viewers with QAM receiving capabilities . . . to view programming that is broadcast unsecured on certain groups of channels used for 'on demand' broadcast" and "free reception of unenrypted digital cable programming offered by certain cable providers" (Smoot Decl. ¶¶ 60, 62.) VTran contends that users of QAM tuners can "access all cable programming," but cannot " read the signal providing the dynamically assigned virtual channel, thus operating as a way to prevent viewing by a non-requesting viewer." (Summ J. Resp. 31.) The Court will discuss below whether this argument may set forth a theory of infringement under the doctrine of equivalents; however, VTran's argument cannot establish literal infringement by showing that Defendants' products meet the exact specifications of the VTran Patents' television transmission system. Thus, in light of the absence of any evidence suggesting that the accused products add additional viewers to an existing channel and employ descrambling signals, "no reasonable jury could find" that the "television transmission system" claim limitation, one of the "limitation[s] recited in the properly construed claim" is "found in the accused device[s]," Bai, 160 F.3d at 1353.

2.     **Doctrine of Equivalents**

a.     **The Parties' Contentions**

Defendants reassert that VTran "obliquely alleges" that the accused devices infringe the Patents under the doctrine of equivalents, again without articulating its explanation as to how the doctrine applies. (Summ J. Mot. 18, 19, n. 14.) Defendants further aver that prosecution history

estoppel bars the application of the doctrine to the "television transmission system" limitation of the VTran Patents, because the patentees expressly distinguished prior art on the basis that their invention "permit[s] many users to use shared resources (including <u>shared</u> transmission lines)," as Judge Kauffman found in construing the disputed claim terms.  (Summ J. Mot. 19 (internal quotation marks omitted).)  Defendants then contend that because their VOD services "do not allow multiple viewers to choose the same program at the same time such that additional requesting viewers can be added to a transmission on a particular channel by transmitting appropriate descrambling signals," applying the doctrine of equivalents to find that the accused services infringe upon the "television transmission system" limitation of the VTran Patents would result in "improper claim element vitiation."  (Defs.' Summ. J. Mot. 20.)

 VTran responds that it is not estopped from making doctrine of equivalents arguments respecting the "television transmission system" limitation, because "the rationale underlying the narrowing amendment bore no more than a tangential relation to the equivalent in question." (Pl.'s Summ. J. Resp.. 36 (internal quotation marks omitted).)  Turning first to the requirement that "multiple viewers [be able] to choose the same program at the same time," VTran and its expert Dr. Smoot contend that Defendants' VOD systems do allow for this through the "common and authorized use of QAM tuners."  (Pl.'s Summ. J. Resp. 37.)  In addition, although the VTran Patents describe using "appropriate descrambling signals," Defendants employ an equivalent, "channel mapping information with the transmission so that only a requesting cable set-top box can find the dynamically assigned virtual channel associated with that transmission."  Pl.'s Summ. J. Resp. 37.)  VTran again concludes that Dr. Smoot's "unopposed opinion is more than sufficient evidence from which a jury could find for VTran on the 'television transmission

system' limitation."  (Pl.'s Summ. J. Resp. 38 (emphasis removed).)

    **b.**  **Analysis**

   According to VTran, Dr. Smoot's declaration "provided substantial evidence that the

QAM tuner capabilities of the Defendants' systems allow multiple viewers to choose the same

program at the same time such that once the chosen program is scheduled for transmission on a

particular channel, additional viewers can be added."  (Pl's Supp. Br. 5.)  VTran further contends

that Dr. Smoot conducted a "function-way-result analysis" that shows that the accused systems

"perform substantially the same function, in substantially the same way, to achieve substantially

the same result, i.e., to transmit the appropriate descrambling signals to the requesting viewer's

receivers."  (Pls.' Supp. Br. 5.)

   Turning first to the "function" of Defendants' systems and the system described in the

VTran Patents, Dr. Smoot contended that "[e]ach allow[s] only the requesting set-top box to

view the requested transmission."  (Smoot Decl. ¶ 113.)  This purported "function," however, is

at odds with the specification and prosecution history which Judge Kauffman analyzed in his

Markman decision, and described as follows:  "[Applicants] clearly and consistently described a

television transmission system that allowed multiple viewers to watch the same program

transmission simultaneously and that used descrambling signals to achieve this objective."

VTran I, 2009 WL 2169155, at *7.  Thus, while aggregation may not have been the primary goal

of the VTran Patents,[8] the intrinsic evidence demonstrates that in describing a "television

---

   [8]In addition, at the hearing the Court held on Defendants' Summary Judgment Motion,
VTran, though disagreeing that the objective of the patent was to "aggregate viewers"
nonetheless conceded that "one aspect of the overall objective" was to provide viewer
aggregation, (Summ J. Hr'g Tr. 60:2-5; see also Summ. J. Hr'g Tr. 59:20-23 (contending that the
fact that Defendants' "system[s] allow[] the use of a QAM tuner is sufficient" to meet the

transmission system," the function the Patents aimed to achieve was that of viewer aggregation.

As for the means of carrying out this function, the VTran Patents describe having users of the same program employ the same channel, to which additional viewers can be added, and using appropriate descrambling signals to allow only authorized users to view a selected program.  See id. at *6-7.  In contrast, the evidence in the record does not indicate that in the accused services, multiple viewers use the same channel to view the same on-demand program at a particular time. VTran assert that the use of QAM tuners technically allows all cable users to access cable programming, but that a "dynamically assigned channel signal" is used to permit only an authorized viewer to access the program.  (Summ J. Resp. 31.)  Arguing that all cable users have access to cable programming, however, is not the same as evidence establishing that multiple viewers can watch the same stream of a purchased on-demand program, and that additional viewers can be added.

The Court need not determine at this time whether the record demonstrates that Defendants' systems use dynamically assigned channel signals and encryption to allow only authorized users to access on-demand programming, as VTran contends, because even assuming arguendo that this is the case, a jury could not reasonably conclude that Defendants' systems meet the television transmission system claim limitation by allowing for multiple, authorized users to watch an on-demand program at the same time.  Users of QAM tuners are not "requesting viewers" under the VTran Patents, because they have not chosen the time of day to watch the program.  Even if they are able to watch an on-demand program purchased or selected by another individual, the users of QAM tuners passively watch this program, and must be

---

television transmission system limitation of "allow[ing] multiple users")).

subject to the pausing, rewinding, and fast-forwarding decisions of the on-demand purchaser, nor

is there any indication that the QAM tuner users are authorized users.

Moreover, Judge Kauffman already disposed of VTran's argument that "communicating

the specific channel number . . . only to the requesting viewer" prevents intelligible viewing in a

similar way as using descrambling signals.  See  VTran I, 2009 WL 2169155, at *8.  In

construing "preventing intelligible viewing," another disputed claim in the patent that is not at

issue in the Motion under consideration, Judge Kauffman concluded that these two systems are

distinguishable because under a system that only communicates the channel for the on-demand

program to the requesting viewer, as in Defendants' accused systems, "non-requesting viewers

who inadvertently encounter the program when changing channels would be able to view it

intelligibly."  Id.

As a result, a jury cannot conclude based on the evidence in the record that the ways in

which the VTran Patents and the accused products allow for multiple viewers, but only permit

authorized users to view the program, if they do at all, are substantially similar to VTran's

patented system.  VTran, even with Dr. Smoot's testimony, cannot satisfy the function-way-result

test to establish the equivalence of Defendants' accused products for purposes of the "television

transmission system" limitation.[9]   Thus, the Court is inclined to grant Defendants' Summary

_____

[9]Defendants also argue that VTran is estopped from raising a doctrine of equivalents infringement claim against the accused products for purposes of the "television transmission system" limitation.  The Court, however, is not so persuaded, because it is somewhat contested whether Defendants' accused products allow for multiple viewers to view the same program at the same time, and can add supplemental viewers to an existing channel.  This may in fact be part of the discovery that VTran seeks.  Nonetheless, as the analysis explains, even assuming that Defendants' accused devices allow for aggregate viewing, it is doubtful that VTran can demonstrate that the accused products infringe upon the VTran Patents under the doctrine of equivalents, or that there is a factual issue for trial.

Judgment Motion on the basis that the accused products do not meet the "television transmission system" limitation of the VTran Patents.

### IV.      Request for Additional Discovery

In responding to Defendants' Motion for Summary Judgment, VTran contended that although it received discovery respecting numerous, relevant factual issues, "Defendants were none the less able to provide cherry picked discovery which was never subjected to explanatory deposition," and VTran "concurrently moves for Discovery to be reopened in this case." (Summ. J. Resp. 16.)  VTran's responding brief, however, did not specify what additional discovery was sought nor was an affidavit providing such specificity appended, as required by Rule 56(f), nor, as already explained, did VTran file a Rule 37 motion to compel that requested that the Court require additional discovery (see Summ. J. Hr'g Tr. 56:5-10).

At oral argument, the Court gave VTran the opportunity to specify the additional discovery it seeks in a post-hearing affidavit pursuant to Federal Rule of Civil Procedure 56(f). (See Summ. J. Hr'g 56:12-17.)  Rule 56(f) provides that the Court can deny a summary judgment motion or order a continuance to enable additional discovery to be undertaken "[i]f a party opposing the [summary judgment] motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition."  Fed. R. Civ. Proc. 56(f); see also Pastore v. Bell Telephone Co. of Pa., 24 F.3d 508, 510-11 (3d Cir. 1994) (explaining that "[i]f a party believes that s/he needs additional discovery, Fed. R. Civ. P. 56(f) specifies the procedure to be followed, and explicitly provides that the party must file an affidavit setting forth why the time is needed," and thus, that a concession that the party has failed to do so is "usually fatal").

VTran then submitted a supplemental letter brief reasserting that additional discovery is

warranted, that summary judgment is inappropriate prior to such discovery, and requested that it is entitled to deposition testimony regarding whether subsequent transmissions within a 24 hour period are within the current open session or separate transactions, and the degree to which Defendants "encrypt their VOD systems" to affect the functionality of QAM tuners, which is a "highly confidential aspect of their systems." (Pl.'s Supp. Br. 16-18.) Strikingly, VTran, though reciting the Rule 56(f) affidavit requirement (Pl.'s Supp. Br. 15), has still never provided such an affidavit.

The Court notes that VTran has repeatedly ignored opportunities and its obligation to timely request additional discovery and to file a Rule 56(f) affidavit in connection with its request for more discovery before the Court adjudicates Defendants' Summary Judgment Motion. The first opportunity or obligation arose before Defendants filed their Motion for Summary Judgment. This Court had never finally ruled on any limitations on discovery. Although the Court's initial discovery Order expressly authorized only written discovery, nothing in the Order forbade eventual depositions of the parties or third parties. As noted above, a scheduled discovery hearing was cancelled because the parties reached agreement. Perhaps VTran wanted to see if it could secure denial of Defendants' Motion for Summary Judgment without undergoing the expense of further discovery, but it never articulated such a strategy. VTran's failure to seek additional discovery opened the door to a substantial risk that summary judgment would be granted, and that there would be no additional discovery. Why VTran decided to undertake such risk is unclear.

VTran subsequently had a second opportunity to file a Rule 56(f) affidavit as part of its opposition to Defendants' Summary Judgment Motion, prior to oral argument. Again, VTran

filed to file the affidavit.

VTran's third opportunity arose after oral argument, when the Court clarified that VTran should file a Rule 56(f) affidavit detailing what further discovery it needed, the reasons why it is entitled to such discovery, and what discovery it hoped to find which would warrant denial of summary judgment in Defendants' favor.  (See Summ. J. Hr'g Tr. 56:12-17.)  VTran again failed to do so.

Perhaps VTran's counsel is under the impression that the Smoot Declaration satisfies its Rule 56(f) obligations; however, it does not.  The Court believes the record would warrant denial of VTran's latest request for further discovery, particularly in the continued absence of a Rule 56(f) affidavit, which VTran has already had three opportunities to file, but is loathe to grant summary judgment merely because of a procedural default.

Reluctantly, the Court will give VTran one last opportunity to file a Rule 56(f) affidavit. In doing so, VTran must be very specific, either by naming deponents or detailing the subject matter of a deposition it would take pursuant to Rule 30(b)(6) of a corporate designee.  In addition, VTran should detail why it did not previously request this discovery, what facts it expects to learn from these depositions, why it cannot secure the information from either its own witnesses, its own experts, or from documents it has already received, and how that deposition would aid the Court and result in denial of Defendants' Motion for Summary Judgment, on the "television transmission system" issue.

For these reasons, out of an abundance of caution, the Court will give VTran an additional twenty-one (21) days to file such an affidavit, although the Court expresses no opinion as to whether such an affidavit would change the Court's analysis of whether Defendant's

27

Summary Judgment Motion should be granted.  Defendants may respond within fourteen (14) days.

## V.      Conclusion

 For the reasons above, the Court is inclined to grant Defendants' Motion, but will give VTran an opportunity to submit an affidavit pursuant to Federal Rule of Civil Procedure 56(f).

An appropriate Order follows.

O:\CIVIL\VTRAN Media MDL 1948\VTRAN MDL - Memo MSJ.wpd